UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

Daniel Allen and Cathleen Allen

    Plaintiffs,

    vs.

United States of America,

    Defendant.

Hon.

Case No.

---

## COMPLAINT

### Introduction

This case arises out of the May 19, 2020 Edenville Dam disaster occurring on the Tittabawassee River north of the City of Midland, Michigan. Dan and Cathleen's home and property were destroyed in the flooding caused by the failure of the dam. The Federal Government, through decades of negligence and failure to act in accordance with its own statutory obligations, was a major contributing factor to this disaster. This lawsuit seeks to hold the Federal Government accountable for the damages it caused by its unconscionable conduct.

Twenty-seven years ago in 1993, the Federal Energy Regulatory Commission ("FERC") recognized that the Edenville Dam posed a substantial risk to Michigan residents and property owners living downstream from the dam. At that time, FERC ordered the then-owner and operator of the Edenville Dam to make immediate improvements to the dam to prevent a catastrophic breach or flood downstream. Without these repairs and upgrades, the Edenville dam was a dangerous instrumentality.

In 2006, FERC, through its gross incompetency and deliberate indifference, transferred the license to operate this dangerous dam to a new owner, Boyce Hydro Power LLC ("Boyce").   FERC, in transferring the license to operate, had a mandatory duty to ensure that this known dangerous instrumentality would be operated safely. Indeed, FERC had already established the dam's dangers in 1993 under the previous owner and knew that Boyce was taking control of a dam that posed an imminent threat.

After the Edenville dam failed on May 19, 2020, FERC Chairman Neil Chatterjee was called before members of Congress on June 18, 2020. Chatterjee admitted that FERC had issued a license to Boyce to operate the Edenville Dam without complying with its mandatory statutory obligation to first determine if Boyce could manage, operate, and maintain the dam safely. FERC's failure to vet Boyce was another direct cause of this disaster because, if FERC had performed its

required due diligence, FERC would have determined that Boyce did not have the financial ability, competency or good faith motivation to make the dam safe or to protect the residents and property owners living downstream. Therefore, by FERC's own standards, Boyce was not qualified or eligible to operate a dam categorized as High Hazard.

For fourteen years after Boyce acquired its license, FERC allowed Boyce to defy numerous orders to make the dam safe. FERC knew that the Edenville dam was categorized as a High Hazard dam and a dangerous instrumentality, and it negligently entrusted this dangerous instrumentality to a recalcitrant, dishonest, under-capitalized, and incompetent operator.

On May 19, 2020, because of FERC's negligence, thousands of Michigan residents and property owners downstream suffered substantial property harm, and in some cases catastrophic injuries, when the dam breached and water generated a 25-foot wave and ensuing flood.

FERC also had a mandatory duty to ensure that Boyce complied with all safety and emergency regulations. FERC, aware of the predicted rainstorms moving into the Midland Region, knew of the dangers at hand and had the authority to order a drawdown of the reservoirs behind the Smallwood, Secord and Sanford Dams. If FERC had ordered drawdowns before May 20, 2020, the collapse of the Edenville Dam would have been prevented. FERC's negligence in refusing to order a

drawdown and fulfilling its monitoring duties also contributed to the damages alleged in this lawsuit.

FERC's negligence in this case spans multiple decades, dam owners, and Federal Administrations. The constants are FERC's statutory responsibility and the deteriorating condition of the dam that endangered the property and bodily integrity of the surrounding communities.

### Jurisdiction, Venue, Parties and Exhaustion of Administrative Remedies

1.    This Court has subject matter jurisdiction over the Defendant because the United States of America is sued pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1).

2.    Venue is proper in cases involving tort claims against the United States of America where the Plaintiff resides or where the act or omission complained of occurred. 28 U.S.C.§ 1402(b); 32 C.F.R. 759.32(a).

3.    Plaintiffs reside in this Judicial District and the acts and omissions complained of occurred in this Judicial District.

4.    On July 20, 2020, Plaintiffs, through their counsel, submitted a SF 95 administrative claim to the Federal Energy Regulatory Commission ("FERC") for personal and property damages arising out of the FERC's negligent handling of Boyce as the operator of the hydroelectric dams at issue.

5.     FERC acknowledged receipt of the SF 95 administrative claim on August 6, 2020.

6.     On September 4, 2020, counsel for Plaintiffs received an email from Kathryn B. Allen, Office of the General Counsel-General and Administrative Law, denying the administrative claim.

7.     This lawsuit is timely filed within 6 months of the first notice of the denial of the administrative claim.

## STATEMENT OF FACTS

**History of FERC's Transfer of its License to Boyce and its 27-year Knowledge that the Edenville Dam was a Dangerous Instrumentality.**

8.     Wolverine Power Corporation ("Wolverine"), a dissolved corporation, was a Michigan corporation that originally held the FERC license to operate the Edenville Project/Dam. Wolverine also owned the properties on which the Edenville Dam and other dams were located.

9.     In an August 6, 1993 letter from the Commission's Office of Energy Projects, Division of Dam Safety and Inspections, Chicago Regional Engineer ("Regional Engineer") to Wolverine, FERC advised that the spillway capacity of the Edenville Project did not meet the Commission's guidelines for passing the amount of water known as "probable maximum flood" ("PMF").

10.   FERC was aware of this life-threatening deficiency in the Dam's spillway capacity for almost 27 years prior to the May 19, 2020 Edenville Dam disaster.

11.   From 1993 to the day the Edenville Dam collapsed on May 19, 2020, FERC knew the unrepaired dam was a dangerous instrumentality.

12.   Synex Energy Resources Ltd., a subsidiary of Synex Power, Inc., reportedly acquired the real estate assets of Wolverine, including the Edenville Project, in a foreclosure proceeding in 2003. Synex Energy Resources then transferred those real estate assets to a new subsidiary, Synex Michigan, LLC.

13.   Synex Michigan, LLC thus acquired the operating business of Wolverine, including the purchase of Wolverine's remaining assets and the license to operate the Edenville Project/Dam from Wolverine on or about June 23, 2004.

14.   On or about March 17, 2006, Boyce purchased 100 percent of the interests of Synex Michigan, LLC.

15.   Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC, ("Boyce") and filed a statement with the Commission on July 12, 2007 to this effect.

16.   The Boyce Projects are located on the Tittabawassee River in Gladwin and Midland counties, in mid-Michigan. The Secord Project is the most upstream of the Boyce Projects. The Smallwood Project is located approximately seven river miles downstream from the Secord Project. Boyce's now-unlicensed Edenville

Project (formerly FERC Project Number 10808), is located approximately 13 river miles downstream of the Smallwood Project, at the confluence of the Tittabawassee and Tobacco Rivers. The Sanford Project (the most downstream of the Boyce Projects) is located approximately 11 river miles downstream of Edenville Dam.

17.    The Edenville Dam is one of a group of four dams that were built in 1924 to generate hydroelectric electricity. It is located about 21 miles north of Midland on the Tittabawassee River.

18.    In addition to electric power generation, flood control is widely recognized as another key reason for dams being added to the Tittabawassee River.

19.    The other dams in the group are the Sanford, Smallwood and Secord.

20.    All four dams are earthen embankments with concrete spillways.

21.    The Edenville Dam was constructed in two sections: one embankment across the Tittabawassee River and one across the Tobacco River. The hydroelectric facilities built with this dam comprise 4.8 megawatts of total generation capacity. The electricity produced by the Edenville Dam has been sold under a long-term power purchase agreement with Consumers Energy, an investor-owned public utility. Water held by the dam formed a 2,600-acre reservoir called Wixom Lake. Water held by the Sanford Dam downstream formed the 1,569-acre Sanford Lake.

22.    The three Boyce Projects and the former Edenville Project are closely-linked to each other, sharing common ownership and hydrology.  Indeed, FERC

issued the operative licenses for all four projects on the same day, noting that it intended to coordinate treatment of these four "hydrologically-related" projects in the future.

**FERC Subjected the Public To An Unreasonable Risk Of Harm By Licensing And Permitting Boyce To Operate The Dams Without Regard To Public Safety**

23.     The four projects also are linked by Boyce's troubled compliance history. Its compliance failures at the formerly licensed Edenville Project were particularly egregious, as Boyce ignored FERC staff's dam safety requirements for 14 years.

24.     According to media reports, Boyce's primary interest in the Edenville Dam and the other dams was to use the properties as a tax shelter:

> [Boyce owner Lee] Mueller and his relatives needed to reinvest money from the sale of an Illinois property in less than a year–or pay $600,000 in taxes to the IRS. Eventually, a solution came to Mueller, an architect who lives in Las Vegas, and his cousin, Michel d'Avenas, a California musician who is the son of a French count and is now known as the Pebble Beach Bagpiper. They would avoid taxes by purchasing four small hydroelectric dams in mid-Michigan near Midland ....The cousins had 45 days to find alternative sites and six months to buy one, or they risked having to pay more than $600,000 in capital gains taxes. Mueller and his associates identified the four Midland dams and buildings in Indianapolis and Houston as options and bought the dams in 2006 after borrowing money to complete the purchase.

25.     FERC routinely found Boyce's plans for auxiliary spillway work to be insufficient.

26.     Rather than fund the necessary repairs and upgrades to its dams, Boyce attempted to coerce community members into paying.

27.     In August 2010, the Sanford Dam's earthen dike began to seep. The next year, "Lee Mueller (Owner of Boyce) sa[id] he won't pay for the estimated $83,000 repair. Footing that bill is up to property owners and businesses that benefit from the 1,250-acre recreational impoundment in Midland County, he argue[d]..... He sa[id] if funds aren't raised for the repair work, Boyce Hydro will surrender its license to operate the dam and permanently drain Sanford Lake." One property owner characterized Boyce's actions as follows: "He's holding the dam hostage for someone else to fix it. Because he doesn't want to fix it."

28.     In 2012, Tobacco Township, a local government entity, sued Boyce for its failure to make repairs to the Edenville Dam.

29.     While Boyce had assured FERC that it would complete construction on auxiliary spillways in 2014, and 2015, it missed the 2014 deadline.

30.     FERC promulgated a plan to have Boyce construct one of the spillways in 2015. Boyce missed those deadlines as well. The two auxiliary spillways were never constructed.

31.     Not only did Boyce fail to construct the required spillways, it failed to even submit "complete and adequate plans" for the work.

32.    In 2015, Boyce failed to disclose to FERC that a spillway wall had failed. They attempted to repair the wall without reporting to FERC.

33.    FERC learned of and cited Boyce for these failures, stating, "[t]he licensee is presenting a serious risk to the infrastructure of this high hazard potential dam by performing unauthorized repairs and then providing no information about those repairs."

34.    In 2016, an independent safety inspection report found that Boyce "should continue to work for review and approval of the existing spillway rehabilitation projects which will allow the dam to safely pass the 100% PMF."

35.    FERC in a 2017 Report emphasized that

> Boyce's failures caused a 'grave' risk for the 'potential loss of life and destruction of property and infrastructure': Given Edenville dam's high hazard potential rating, the potential loss of life and destruction of property and infrastructure is grave should the project not be maintained and operated appropriately, with consequences that could certainly affect the Village of Sanford, Northwood University, City of Midland, Michigan, and other areas downstream. The Commission's Dam Safety Guidelines require the project works to be designed to either withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF), or to the point where a failure would no longer constitute a hazard to downstream life and/or property. In the alternative, the capacity of the spillway must be adequate to prevent the reservoir from rising to an elevation that would endanger the safety of the project works. As summarized in an August 6, 1993 letter from the Regional Engineer to the prior licensee, the spillway capacity of the Edenville Project does not meet the

> Commission's guidelines for passing the PMF. The Regional Engineer has repeatedly directed the licensee to address the spillway capacity concerns at the project."

36.    Consequently, on February 2018 the FERC recommended revocation of Boyce's license for the Edenville Project/Dam.  It said:

> The Commission's primary concern has been the licensee's longstanding failure to address the project's inadequate spillway capacity, which currently is designed to pass only approximately 50 percent of the PMF. Failure of the Edenville dam could result in the loss of human life and the destruction of property and infrastructure.

37.    Finally, in 2018, due to the extreme hazards posed by the condition of the Edenville Dam and Boyce's callous indifference towards the lives and properties of others, FERC revoked Boyce's license to generate hydroelectric power from the Dam. FERC determined that Boyce "knowingly and willfully refused to comply with major aspects of its license" and had "repeatedly failed to comply" with directives to "develop and implement plans and schedules to address the fact that the [Edenville Dam's] spillways are not adequate to pass the probable maximum flood, *thereby creating a grave danger to the public.*"

38.    FERC observed that "the licensee [Boyce] has displayed  a history of obfuscation and outright disregard of its obligations. We do not often revoke a license, but the licensee has left us with no other way to vindicate the public interest here."

39.     Upon revocation of the license, jurisdiction over the Edenville Dam passed from FERC to the State of Michigan's Department of Environmental, Great Lakes and Energy ("EGLE").

40.     Because FERC retained jurisdiction over the Sanford, Secord and Smallwood Boyce Hydroelectric Projects/Dams, FERC and the State of Michigan had joint jurisdiction over the four Hydroelectric dam projects at the time of the Edenville catastrophe.

41.     On or about May 19, 2020, the Edenville Dam failed, resulting in catastrophic flooding to downstream areas. The Edenville Dam failed so completely that the downstream Sanford Dam suffered overtopping damage before breaching as well, causing areas even further downriver to be engulfed by floodwaters.

42.     As a result of the cascading failure of the Edenville and Sanford Dams, more than 11,000 people living in Gladwin, Midland, and Saginaw Counties near Sanford Lake and the Tittabawassee River were forced to flee from imminent danger and seek higher ground. Many of their homes, businesses, and property have been destroyed.   Thousands of others who have not evacuated or experienced property damage have nevertheless had their daily lives upended as the floodwaters continue to damage essential infrastructure in the area, such as bridges and roads, and have interfered with essential utilities services like sanitary sewage.

43.    In many cases, evacuees fleeing the rising floodwaters were cast further into harm's way. Like the rest of the country, the State of Michigan is in the midst of the COVID-19 Pandemic, with restrictions in place on movement and economic activity that severely limit the ability of evacuees to find safety outside of their homes. In the words of Michigan Governor Gretchen Whitmer, "to go through this in the midst of a global pandemic is almost unthinkable."

44.    On May 20, 2020, the day after the disaster, David E. Capka, P.E. Director Division of Dam Safety and Inspections of FERC wrote a letter to Boyce stating in part:

> Following the breach of the Edenville Dam, the Sanford Dam was overtopped by the increased inflow from the upstream breach. The overtopping flows led to a declaration of imminent failure by local authorities and triggered additional evacuation efforts. Due to the extensive damage to the projects and the region as a result of the floodwaters and the Edenville breach, **you are directed to fully lower the reservoirs behind Sanford Dam, Smallwood Dam, and Secord Dam in a safe manner as flows recede.** You are also directed to perform a dam safety inspection of these dams immediately and within 3 days after the flows recede. (Emphasis added).

45.    On May 26, 2020, Mr. Capka wrote to Boyce again stating in part:

> We do understand that the right embankment at Sanford Dam (P-2785) was fully breached during the high flows resulting from the Edenville Dam breach. Therefore, the directive to safely draw down the Sanford reservoir is

13

moot due to the inability of the project to retain the reservoir. **The drawdown requirements at both Secord (P-10809) and Smallwood (P-10810) have not changed and you must draw each down to the spillway crest at a minimum. These actions are necessary in order for possible dam safety issues at your projects to be assessed.** Depending on the results of the evaluations, you may be required to draw one or both reservoirs down further. It is your responsibility to ensure a safe drawdown rate based on all project factors, including embankment stability, spillway Project No. 2785 2 gate operations, and debris issues. You must not return either reservoir to "normal" levels until you have received authorization from FERC. (emphasis added)

46.     As a result of the failure of the Edenville Dam, approximately 2,500 homes and buildings were damaged, approximately 150 of them catastrophically. The citizens and businesses of Gladwin, Midland, and Saginaw Counties are devastated. Their lives have been turned upside down, their homes and property destroyed, and their livelihoods ruined. The full scope of their losses has not yet come into view, and as the floodwaters recede, they face the growing uncertainty of months, if not years, of rebuilding and restoration.

47.     In June 2020, the State of Michigan estimated that the economic harm from failure of the Boyce facilities exceeded $200 million.

48.     This devastating event and the catastrophic consequences suffered by the communities harmed were entirely preventable because FERC indisputably knew for years that these Dams were inadequate, decrepit, unstable, unsafe, and

would fail under predictable conditions, that Boyce should never have been licensed in the first place, and that Boyce was recalcitrant in its repeated refusal to take action to protect the public.

49.    The calamity befalling the citizens and businesses of Gladwin, Midland, and Saginaw counties is the direct and foreseeable result of the FERC's breach of its mandatory duty to ensure that before licensing Boyce it should determine if Boyce had the capacity and will to "manage, operate, and maintain the project safely." 16 U.S.C.§ 808(2).

50.    The failure of the Edenville Dam and the damages it caused under these circumstances is also the direct and foreseeable consequence of FERC's breach of its mandatory duty not to license, or to allow a license to continue, when it judges that the project is not best adapted to a comprehensive plan for flood control. 16 U.S.C. 803(a)(1). FERC failed in this mandatory duty by allowing Boyce to maintain its license long after determining that Boyce did not satisfy those standards.

## COUNT I

**Violation of 16 U.S.C. §§ 803 and 808:   FERC Failed in its Mandatory Duty to License a Dam Operator Only if it Determines that the Proposed Operator Can Operate the Dam Safely-Negligent Entrustment**

51.    On the day that the Edenville Dam collapsed, FERC and the Michigan Department of Environment, Great Lakes, and Energy (EGLE) jointly regulated the

hydroelectric power dams on Wixom, Secord, Smallwood and Sanford Lakes (Four Lakes).

52.    FERC, for 27 years before May 19, 2020, knew that the unrepaired Edenville Dam was a dangerous instrumentality that posed a grave risk of harm to Michigan residents and property owners living downstream.

53.    FERC had a mandatory duty under the Federal Power Act ("FPA") and its regulations to determine whether Boyce, as operator of the Four Lakes hydroelectric dam operations, had the financial ability and expertise to "manage, operate, and maintain the project safely." 16 U.S.C.§ 808(2)(B).

54.    FERC granted Boyce a license to operate the Edenville Dam in 2007 without making this mandatory assessment.

55.    If FERC had made the required assessment, it would not have negligently entrusted the operation of the dam to Boyce.

56.    At that time, and throughout the entirety of FERC's exercise of jurisdiction over it, the Edenville Dam was rated by FERC as a "High Hazard Dam" because its failure would cause loss of human life.

57.    When FERC transferred the license to Boyce it knew it was permitting it to be the operator of a dangerous instrumentality unless the necessary repairs and upgrades were made.

58.    On June 18, 2020, FERC Chairman Neil Chatterjee admitted in testimony before Congress that FERC had issued a license to Boyce to operate the Edenville Dam without complying with its mandatory statutory obligation to first determine if it could manage, operate, and maintain the dam safely.

59.    Within a short time after receiving its license to operate, Boyce, through its flagrant non-compliance with FERC orders to make the Edenville Dam safe, demonstrated to FERC that it did not have the financial resources, know-how, willingness, or good faith motivation to eliminate the characteristics of the dam which made it a dangerous instrumentality or to carry out its operations safely.

60.    The collapse of the Edenville Dam on May 19, 2020 was the direct result of FERC's failure to comply with the legal mandate to grant a license only to a financially sound and competent operator who would operate a High Hazard Dam safely. If FERC had followed its mandate, the disaster would not have occurred because Boyce would not have been granted a license.

61.    Boyce's repeated recalcitrance, unwillingness, or inability to repair, operate and maintain the Dam in a safe manner caused the Dam to collapse. FERC's negligent failure to comply with its mandatory duty to determine Boyce's fitness to operate the dam is a direct and proximate cause for the injuries and damages experienced by Plaintiffs.

62.     The Federal Tort Claims Act provides that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C.§ 267.

63.     Michigan recognizes the tort doctrine of negligent entrustment. The two elements of the tort are that the entrustor (FERC) negligently entrusted the dangerous instrumentality (Edenville Dam) to the entrustee (Boyce) and the entrustee (Boyce) negligently or recklessly misused the instrumentality. *Allstate Ins. Co. v. Freeman*, 160 Mich. App. 349, 357, 408 N.W.2d 153 (1987), aff'd 432 Mich. 656, 443 N.W.2d 734 (1989), mod 433 Mich. 1202, 446 N.W.2d 291 (1989).

64.     FERC had a mandatory duty to grant Boyce a license in the first instance only if it determined that Boyce was fit to operate a High Hazard Dam safely. FERC never fulfilled this mandatory statutory obligation.

65.     The Edenville Dam was rated a High Hazard dam and in failing to follow this statutory mandate, FERC negligently entrusted the ultra-hazardous activity to Boyce who recklessly misused its license.

*66.*     A reasonably prudent licensor would have required Boyce to make the necessary upgrades and repairs to render the dam safe *before* it issued Boyce a license.

67.    In addition, FERC violated its mandatory duty as a licensor every day that it allowed Boyce to continue operating the Edenville Dam under a federal license despite knowing that Boyce did not maintain the project in a manner best adapted to a comprehensive plan for flood control. 16 U.S.C. § 803(a)(1).

68.    FERC is therefore liable for the damages it caused by entrusting the operation of a High Hazard dam to an unfit and reckless dam operator in the first instance (in violation of FERC's mandatory duties under § 808) and by continuing to permit the licensee to operate the dam in a manner that was not suited to a plan for flood control (in violation of FERC's mandatory duties under § 803).

## COUNT II

**Violation of 16 U.S.C. § 823b:  FERC Failed in its Mandatory Duty to Monitor the Integrity of Dams Under its Jurisdiction-Negligence**

69.    The FPA, 16 U.S.C. § 823b, provides that the "Commission [FERC] shall monitor and investigate compliance with each license and permit issued under this subchapter…"

70.    This duty to "monitor" includes the obligation to monitor the integrity of dams under its jurisdiction.

71.    Prompt detection and evaluation of information from instrumentation and physical monitoring is critical to a timely emergency response.

72.    When a dam is not continuously attended and an incident could endanger life or cause significant property damage, it is imperative that

instrumentation be installed and/or procedures developed to monitor the conditions of the facility.

73.    To promptly identify and notify emergency management authorities of emergency conditions, FERC has a mandatory statutory obligation to work with the dam owner and co-jurisdictional authorities to detect, confirm and evaluate developing conditions.

74.    This obligation may include the installation of remote surveillance systems that include instrumentation for continuous monitoring of conditions.

75.    At the time of the Edenville Dam collapse, despite these mandatory requirements, FERC and Boyce had in place either inadequate or non-existent emergency surveillance and monitoring instrumentation or procedures and it was this failure which contributed to the dam's demise.

76.    In the days and weeks prior to the failure of the Edenville Dam, FERC was aware of the weather reports for the Midland Region, and notwithstanding its knowledge of the dangers posed by excessive rainfall, failed to use ordinary care in caring out its mandatory obligation to monitor the integrity of dam structures under its jurisdiction.  As a result of this negligence, Plaintiffs experienced a substantial loss of property.

77.    In recognition of this obligation to monitor dam integrity, FERC on May 20, 2020, the day after the Edenville Dam collapse, ordered Boyce to lower the water level of Sanford, Smallwood and Secord reservoirs.

78.    FERC had the authority to order Boyce to draw down the reservoirs of the Smallwood, Secord and Sanford dams as demonstrated by the May 20, 2020 post Edenville Dam collapse orders of FERC Engineer Mr. Capka.

79.    Had FERC exercised this authority to order a draw down in a competent and non-negligent manner before May 20, 2020, the Edenville Dam disaster could have been prevented.

80.    FERC's failure to exercise its authority to order a draw down directly caused the catastrophic flooding that resulted from the failure of the Edenville Dam.

## DAMAGES

81.    The Allens experienced major property damage to their residence located 4589 N. Island Drive, Sanford MI, 48657.   This is a single-family split-level home with 3 bedrooms, library, finished basement, (2) full baths, (2) one-half baths, and 3,267 sq ft. The house is wood frame with stone and hardy board siding and was on a waterfront parcel with 263 feet of frontage and dock (Sanford Lake) with a side canal of 348 feet. The house has (2) two car garages.

82.    Plaintiffs purchased the house in June 2017 for a purchase price of $330,000. The home was extensively renovated for a cost of $450,000.  A handicap

accessible wing for disabled parents was the focus of the renovation.  The home cost with improvements, prior to the dam collapse, was about $883,000.

83.     After the dam failed, water filled the basement of Plaintiffs' home and rose to a level of three to four feet on the first floor, including both garages.  One to four inches of mud was left in the basement, crawl spaces, and throughout the first floor and garages after the water receded. One exterior wall of the house was damaged.

84.     The cost to repair the real property has been about $157,000 to date.

85.     In addition, the Allens have experienced a loss of personal property valued at about $150,000 to date.

86.     The Allens renovated the home and combined households with their parents so their parents could remain at home until the end of their lives.

87.     Due to the severe damage throughout the first floor of the home, Mrs. Allen's 86-year-old handicapped mother had no place to live.  Plaintiffs were forced to send her to temporarily live with relatives in California. The Allens were able to arrange for her to move into an assisted living facility located several miles from the home.  Her combined monthly social security and her husband's pension is insufficient to cover the assisted living costs and will quickly drain her limited savings.

88.     The impact of the dam failure has resulted in significant hardships and stress on the Allens.  In addition to the property not being able to be used for its intended purpose of living and caring for parents, unplanned long-term care expenses have resulted.

89.     The Allens have experienced property damage losses, a loss of property value and full enjoyment and use of property caused by the loss of the Sanford Lake and other negative property value consequences resulting from the dam collapse and ensuing flood.

## REQUEST FOR RELIEF

Accordingly, the Allen's request $1.250 million in restitution and damages computed as follows:  $780,000 for the repair of the home and replacement of lost items and loss of property value, and another $220,000 in consequential economic damages to help defray long-term residential care costs for Mrs. Allen's disabled mother who has been displaced from the Allen home and $250,000 jointly for the emotional distress caused by FERC's negligence.

Respectfully submitted,

PITT MCGEHEE PALMER                    Stern Law PLC
BONANNI & RIVERS, PC


*/s/ Michael L. Pitt* (P24429)              */s/ Kenneth A. Stern* (P30722)
Michael L. Pitt (P24429)                Kenneth A. Stern (P30722)
Beth M. Rivers (P33614)                 41850 W. 11 Mile Road, Suite 121
Megan A. Bonanni (52079)                Novi, MI 48375-1857
Kevin M. Carlson (P67704)               Tel: 248-347-7315
Robert W. Palmer (P31704)               ken@sternlawonline.com
117 W. Fourth Street, Suite 200         Co-counsel for Plaintiffs
Royal Oak, MI 48067
Tel: 248-398-9800
mpitt@pittlawpc.com
rpalmer@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
Attorneys for Plaintiffs

Dated:  February 26, 2021