UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANIEL ALLEN and CATHLEEN ALLEN,

                Plaintiffs,                              Case No. 1:21-cv-10449

v.                                                Honorable Thomas L. Ludington
                                                United States District Judge

UNITED STATES OF AMERICA,

                Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

On the evening of May 19, 2020, thousands of Midland County and Gladwin County residents were forced to flee their homes in search of high ground. The Edenville Dam, which had stood for nearly a century on the Tittabawassee River, had failed; the Dam's 2,600-acre reservoir had been unleashed. For many, the Dam's failure spelled disaster. Thousands of homes and businesses were damaged in the historic flooding that followed.

Plaintiffs Daniel and Cathleen Allen are Midland County residents whose home was damaged by the flooding. On February 26, 2021, they filed a complaint against the United States of America ("the Government" or "the United States") under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2761 *et seq.* In short, Plaintiffs claim that the Agency once tasked with monitoring the Edenville Dam, the Federal Energy Regulatory Commission ("FERC"), failed to ensure it was being operated safely and thus should be responsible for the harm it inflicted.

On June 25, 2021, the Government filed a motion to dismiss, arguing that this Court lacks jurisdiction because the Government is entitled to sovereign immunity. For the reasons stated hereafter, the Government's Motion to Dismiss will be granted, and this case will be dismissed.

**I.**

For nearly a century, four dams have sat along a 39-mile stretch of the Tittabawassee River. Starting with the most upstream, they are the Secord, Smallwood, Edenville, and Sanford Dams (the "Dams").[1]

Originally constructed in 1924, the Edenville Dam consists of two earthen embankments spanning the Tittabawassee River and the Tobacco River. The water held by the Edenville Dam forms a 2,600-acre reservoir known as Wixom Lake.[2] Like Sanford Lake, further downstream, Wixom Lake had become a popular recreation site before the Edenville Dam failed, with hundreds of homes and docks lining its shores.

FERC is an independent agency tasked with regulating the sale and transmission of electricity under the Federal Power Act (FPA), 16 U.S.C. § 791a *et seq.* In 1998, FERC issued licenses to Wolverine Power Company ("Wolverine") for the generation of hydroelectric power at the Smallwood, Edenville, and Sanford Dams.[3] *See Wolverine Power Corp.*, 85 FERC ¶ 61,063 (1998). Several years later, Wolverine became insolvent, and the Dams and their licenses were purchased by Synex Michigan, LLC, which later became Boyce Hydro Power, LLC ("Boyce").[4] ECF No. 1 at PageID.6. Ordinarily, FERC would have investigated Boyce's financial capacity to

---

[1] Consistent with the standard outlined *infra* Section II, these facts are derived from the Complaint, the documents to which it refers, and facts judicially noticed. *See Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016) ("[Courts] may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." (internal quotation marks omitted)).

[2] The four lakes formed by the Dams—Wixom Lake, Sanford Lake, Smallwood Lake, and Secord Lake—are commonly referred to as the "Four Lakes."

[3] In 1987, FERC issued a license to Wolverine for the Secord Dam. *See Wolverine Power Corp.*, 41 FERC ¶ 62,192 (1987).

[4] Boyce allegedly acquired the Edenville Dam so that its principals could shelter income from the sale of other property in a like kind exchange of properties. *See* ECF No. 1 at PageID.8.

operate the Dam safely before Boyce could purchase it. *See* 16 U.S.C. § 801 ("No voluntary transfer of any license, or of the rights thereunder granted, shall be made without the written approval of the commission . . . ."); *id.* at § 808(a)(2) (requiring FERC to make certain findings before issuing licenses). But for reasons that remain unclear, FERC never conducted a pretransfer investigation.[5] ECF No. 1 at PageID.16. Instead, in June 2004, FERC issued a short order approving the transfer, which Wolverine and Boyce had finalized nearly a year beforehand. *See Wolverine Power Corp. Synex Energy Res., Ltd. Synex Mich., LLC*, 107 FERC ¶ 62,266, at 64,498 (2004).

With the license secured, Boyce proceeded to generate electricity at the Edenville Dam for the better part of two decades. It was only a matter of months, however, before Boyce was the target of federal regulators.

Shortly after FERC approved the transfer, Boyce sent a letter to FERC conveying plans to build auxiliary spillways at the Dam. *Boyce Hydro Power, LLC*, 164 FERC ¶ 61,178 at P 5 (2018).

---

[5] In a June 2020 letter to Congress, FERC Chairman Neil Chatterjee claimed that FERC never investigated Boyce's financial capacity, as Boyce "had acquired the project assets from Wolverine through a foreclosure sale, which is an exception to the . . . otherwise applicable requirement that the Commission pre-approve a transfer." *See* Letter from Neil Chatterjee, Chairman, FERC, to Frank Pallone, Chairman, H. Comm. on Energy and Com., at 2–3 (June 18, 2020). Chairman Chatterjee was presumably referring to 16 U.S.C. § 801, which exempts transfers by "mortgage or trust deed or judicial sale[]" from the preapproval process. But Chairman Chatterjee's explanation seems inconsistent with FERC's earlier commentary. Indeed, in its 2004 order approving the transfer, FERC seemed to state that the transfer *should* have been subject to preapproval:

> While it appears that Synex Energy lawfully obtained (without prior Commission approval) project property and perhaps the project licenses in foreclosure proceedings, it also appears that Synex Energy's assignment of title to project property and its asserted sale of licenses to Synex Michigan *required prior Commission approval*. However, the record shows that the parties failed to obtain such approvals inadvertently.

*Wolverine Power Corp. Synex Energy Res., Ltd. Synex Mich., LLC*, 107 FERC ¶ 62,266, at p. 64,498 n.4 (2004) (emphasis added). To date, FERC has offered no explanation for the apparent contradiction.

The need for additional spillway capacity was old news to FERC. In 1999, FERC sent a letter to Wolverine describing the need for more spillway capacity as its "primary concern." *Id.* at P 4. The fear was that, without additional spillway capacity, the Edenville Dam could not withstand the "Probable Maximum Flood" (PMF), defined as "the flood that may be expected from the most severe combination of critical meteorologic and hydrologic conditions that is reasonably possible in the drainage basin under study." *Id.* at P 3. The "[f]ailure of the Edenville Dam," FERC later warned, "could result in the loss of human life and the destruction of property and infrastructure." *Boyce Hydro Power, LLC*, 162 FERC ¶ 61,115 at P 3 (2018).

Despite assurances, Boyce's plan to increase the Dam's spillway capacity never materialized. On June 15, 2017, after over a decade of project delays, missed deadlines, and "patently deficient" construction proposals, FERC issued a compliance order directing Boyce to submit specific plans for the construction of auxiliary spillways. 164 FERC ¶ 61,178 at P 9; *Boyce Hydro Power, LLC*, 159 FERC ¶ 62,292 at P 2 (2017). When Boyce did not comply, FERC ordered it to stop generating power. *Boyce Hydro Power, LLC*, 161 FERC ¶ 62,119 at P 2 (2017).

Boyce appealed FERC's order to the Court of Appeals for the District of Columbia Circuit, which stayed the order and allowed Boyce to keep generating power. *See In re Boyce Hydro Power*, LLC, No. 17-1270 (D.C. Cir. Feb. 7, 2018). One week later, FERC formally proposed revoking Boyce's license, explaining that Boyce had "failed to meet nearly all the obligations in the Compliance Order, even after Commission staff granted multiple extensions." 162 FERC ¶ 61,115 at P 10.

Boyce did not request an evidentiary hearing or "dispute that it . . . failed to comply with the Commission's directives." 164 FERC ¶ 61,178 at P 40. Instead, it argued that revocation of its licenses was not in the public interest because, inter alia, "revoking the license would not address

the Commission's primary concern regarding the inadequate spillway capacity." *Id.* FERC disagreed, noting that once it revoked Boyce's license, regulatory jurisdiction over the Edenville Dam would transfer to the Michigan Department of Environmental Quality, which had its own spillway-capacity standards. *See id.* at P 55.

On September 10, 2018, FERC revoked Boyce's license for the Edenville Dam. *Id.* at P 1. As anticipated, the Michigan Department of Environmental Quality, now called the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"), assumed jurisdiction over the Dam.[6] ECF No. 1 at PageID.12. But Boyce continued to operate it.

In 2019, Boyce began negotiating the sale of the Edenville Dam to the Four Lakes Task Force (FLTF), a statutory entity formed under Part 307 of the Michigan Natural Resources and Environmental Protection Act, MICH. COMP. LAWS 324.30701 *et seq.*[7] The FLTF obtained a permit to assess the feasibility of generating power at the Edenville Dam later that year but never sought a license. *See Four Lakes Task Force*, 169 FERC ¶ 62,124 (2019).

In the months leading up to the Dam disaster, Boyce, the FLTF, and EGLE disputed the appropriate water level at Wixom Lake. Their dispute escalated into several lawsuits, the details of which are irrelevant here.[8] Nonetheless, it bears noting that FERC was not a party to any of those lawsuits.

_____

[6] EGLE regulates over 1,000 dams in Michigan and possesses broad authority to ensure dams are safely constructed and maintained. *See* 164 FERC ¶ 61,178 at P 55 (discussing EGLE and its authority).

[7] The law allows two-thirds of the owners of land abutting a lake to petition a county board of commissioners to petition a local Circuit Court to establish a lake level. Midland County and Gladwin County created FLTF by joint resolution in July 2018. FLTF's purpose was to establish a plan for safely maintaining normal lake levels in the Four Lakes.

[8] The Michigan Court of Claims briefly summarized the dispute in its recent decision allowing a group of property owners to sue EGLE for inverse condemnation. *See Krieger v. Mich. Dep't of Env't, Great Lakes, & Energy*, No. 20-000094-MM (Mich. Ct. Cl. May 21, 2021). In summary, the Midland County Circuit Court entered an order in June 2019, upon the FLTF's petition, setting

**B.**

During the week of May 18, 2020, The Tittabawassee watershed experienced unusually heavy rain, leading the National Weather Service and local authorities to warn of potential flash floods. On May 19, 2020, at about 5:30 PM EDT, the Tittabawassee portion of the Edenville Dam collapsed. The cascade of water quickly toppled the already strained Sanford Dam further downstream. The Sanford breach sent a swell of floodwater barreling toward local homes and businesses. Local authorities ordered residents to evacuate, and thousands abandoned their homes and belongings in search of high ground. By the following morning, Wixom Lake and Sanford Lake—altogether some 3,800 acres of water—were virtually empty.

Plaintiffs own a home downstream from the Edenville Dam, along Sanford Lake. ECF No. 1 at PageID.21. The failure of the Edenville Dam, and consequent failure of the Sanford Dam, flooded their home, displacing Mrs. Allen's 86-year-old mother. *Id.* at PageID.22. To date, Plaintiffs have spent roughly $157,000 in home repairs and have lost about $150,000 in personal property. *Id.*

**C.**

Not long after the flooding subsided, dozens of lawsuits were filed in this Court and Michigan courts primarily targeting Boyce and related entities. On July 31, 2020, with thousands of potential creditors lining up, Boyce sought bankruptcy protection. On February 25, 2021, after

---

the legal lake level at Wixom Lake. *Id.* at 4. Later that year, Boyce sought permission from EGLE to lower the lake level, allegedly "due to concerns about the safety of the downstream community." *See id.* at 4–6. EGLE denied Boyce's request, citing potential "damage to natural resources and aquatic life." *Id.* at 4. Boyce proceeded with the drawdown regardless. *Id.* In April 2020, just a few weeks before the Dam's failure, Boyce and EGLE brought their battle into federal court. *See Mueller v. Mich. Dep't of Env't, Great Lakes, & Energy*, No. 1:20-cv-00364-PLM-RSK (W.D. Mich. Apr. 29, 2020).

- 6 -

months of bankruptcy proceedings, Judge Daniel Opperman approved the Boyce entities' bankruptcy plan. Most of the cases filed in this Court have since been voluntarily dismissed.

On February 26, 2021, Plaintiffs brought this action under the FTCA, claiming that FERC negligently entrusted Boyce with the Edenville Dam and then failed to monitor its safety. *See* ECF No. 1 at PageID.15–21. Plaintiffs seek to recover their losses and believe FERC should be held accountable.

On June 25, 2021, the Government filed a motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction. ECF No. 15. The Government's Motion has since been fully briefed. ECF Nos. 20; 24.

## II.

Plaintiffs bear the burden of proving subject-matter jurisdiction. *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). "Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). When the moving party challenges the complaint's sufficiency—a facial attack—"the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Id.* at 598. But when the moving party challenges the factual basis for jurisdiction, "no presumptive truthfulness applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (internal citation omitted).

The Government argues, inter alia, that the Federal Power Act exempts it from liability for Plaintiffs' damages. *See* ECF No. 15 at PageID.71–75. This argument is a facial attack. *See Ritchie*, 15 F.3d at 598. Therefore, this Court must take the well-pleaded factual allegations of the Complaint as true and construe them in the light most favorable to Plaintiffs. *Id.*; *see also Hartman*

*v. Acton*, 499 F. Supp. 3d 523, 528 (S.D. Ohio 2020) ("A facial attack on subject matter jurisdiction is reviewed under the same standard as a 12(b)(6) motion to dismiss.").

### III.

The analysis begins with a principle as old as the common law itself: "[T]he King or Crown, as the font of justice, is not subject to suit in its own courts." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 103 (1996) (Souter, J., dissenting). This principle survives today under a more familiar name: sovereign immunity.[9]

The Supreme Court has long held that the "United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Navajo Nation*, 537 U.S. 488, 502 (2003); *Hercules Inc. v. United States*, 516 U.S. 417, 422–23 (1996); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) (collecting cases); *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *United States v. Thompson*, 98 U.S. 486, 489 (1878). Accordingly, "[s]uits brought against the United States [must be] dismissed unless a claimant can point to an

---

[9] In a nation built on liberty and the rule of law, the notion that the Government can harm its citizens with impunity is generally viewed with disdain—and not just by those who lack legal training. Indeed, scholars and Supreme Court Justices alike have long debated sovereign immunity's continued validity and application in American society. *E.g.*, *Alden v. Maine*, 527 U.S. 706, 795 (1999) (arguing the Supreme Court "ha[d] no historical predicate to argue for a fundamental or inherent theory of sovereign immunity") (Souter, J., dissenting); Erwin Chemerinsky, *Against Sovereign Immunity*, 53 STAN. L. REV. 1201, 1201 (2001) ("Sovereign immunity is an anachronistic relic and the entire doctrine should be eliminated from American law."). Yet sovereign immunity is more than a just holdover from the days of kings and royal courts. As the Supreme Court explains, sovereign immunity serves a legitimate governmental interest in shielding the public treasury from suits that might "threaten [its] financial integrity." *See Alden*, 527 U.S. at 750 ("Private suits against nonconsenting States—especially suits for money damages—may threaten the financial integrity of the States. It is indisputable that, at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages."). Others have argued that sovereign immunity is part of the separation-of-powers scheme, insulating Congress from judicial influence over certain policymaking. *See* Harold J. Krent, *Reconceptualizing Sovereign Immunity*, 45 VAND. L. REV. 1529, 1534–41, 1578 (1992). In a case such as this, it is helpful to remember that the law has its reasons, even if they seem uncompelling to some.

express waiver of sovereign immunity." *Jackson v. United States*, 751 F.3d 712, 716 (6th Cir. 2014). To that end, "[a]ny waiver of sovereign immunity must be unequivocally expressed in statutory text and must be strictly construed, in terms of its scope, in favor of the sovereign." *Gaetano v. United States*, 994 F.3d 501, 506 (6th Cir. 2021) (internal citations and quotation marks omitted).

Plaintiffs bring their claims under the FTCA, which "waives sovereign immunity for certain actions in tort by giving district courts exclusive jurisdiction over those types of civil actions." *Premo v. United States*, 599 F.3d 540, 544 (6th Cir. 2010). A claim is actionable under the FTCA if it is:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Brownback v. King*, 141 S. Ct. 740 (2021) (quoting 28 U.S.C. § 1346(b)). But the FTCA is not a catch-all cause of action for federal wrongdoing. *See Premo*, 599 F.3d at 544 ("The FTCA neither creates causes of action against the United States nor provides a means of enforcing federal statutory duties." (internal citation marks omitted)). On the contrary, the FTCA "is fundamentally limited to cases in which a private individual [would be liable] under like circumstances." *Id.*

Plaintiffs allege that FERC violated at least two statutory duties imposed by the Federal Power Act: (1) the duty to determine whether Boyce had the ability to "manage, operate, and maintain the [Dams] safely"; and (2) the duty to "monitor and investigate [Boyce's] compliance with [the] license." *See* ECF No. 1 at PageID.15–21 (quoting 16 U.S.C. §§ 808(2)(B), 823b). In this way, Plaintiffs argue that FERC would be liable for negligent entrustment and general negligence if it were a private person. *See id.*

- 9 -

The Government advances three arguments in defense: (1) the Federal Power Act expressly exempts the Government from liability for Plaintiffs' damages;[10] (2) FERC's conduct falls within the FTCA's discretionary exception;[11] and (3) FERC was not negligent under Michigan law.[12] This Court finds that the Federal Power Act exempts the Government from liability for Plaintiffs' damages. For that reason, this Court declines to address whether the FTCA's discretionary exception applies or whether FERC's conduct would be actionable under Michigan law.

### A.

The Government's sovereign-immunity defense turns on § 10(c) of the Federal Power Act (FPA), codified at 16 U.S.C § 803(c). Before discussing § 10(c) some background is appropriate.

Until 1920, the licensing of hydroelectric facilities was divided among the Secretaries of Interior, War, and Agriculture, each of whom was tasked with issuing licenses for hydroelectric projects within his respective jurisdiction. *See* GEORGE CAMERON COGGINS & ROBERT L. GLICKSMAN, 4 PUB. NAT. RES. L. § 37:2 (2nd ed. 2021) (discussing history of federal hydropower regulation). With the 1920 passage of the FPA, Congress sought "to eliminate the inefficiency and confusion caused by the piecemeal, restrictive, negative approach to licensing prevailing under prior law." *Escondido Mut. Water Co. v. La Jolla, Rincon, San Pasqual, Pauma, & Pala Bands of Mission Indians*, 466 U.S. 765, 773 (1984).

The FPA centralized the piecemeal licensing of prior decades by establishing one federal agency as gatekeeper for most hydropower developments: the Federal Power Commission, now known as FERC.[13] *See* 16 U.S.C. § 817(1) (prohibiting any person from "construct[ing],

---

[10] *See* ECF No. 15 at PageID.71–75.
[11] *See* ECF No. 15 at PageID.76–80.
[12] *See* ECF No. 15 at PageID.80–83.
[13] When referring to dams and other hydropower-related structures, the FPA uses the term "project works," defined as the "the physical structures of a project." 16 U.S.C. § 796(12). The term

operat[ing], or maintain[ing] any dam . . . across, along, or in any of the navigable waters of the United States," for the "purpose of developing electric power," unless authorized by a "permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to [the FPA]"); *id.* § 797(e) (authorizing FERC to issue licenses for the "construct[ion], operat[ion], and maint[enance] [of] dams" and other project works, consistent with the FPA).

Accordingly, those seeking to construct, operate, or maintain a dam within federal jurisdiction must first apply for a license from FERC. The contents of those applications are strictly governed by federal law. As a general matter, applications must include "maps, plans, specifications, and estimates of cost," and "[s]atisfactory evidence that the applicant has complied with the requirements of [state law]." *See id.* § 802(a). Applicants for certain types of projects are subject to additional requirements, as provided in the regulations. *See generally* 18 C.F.R. §§ 4.30–4.71. For example, applicants for existing dams must provide a detailed "statement of costs and financing," including "[a] statement of the estimated average annual cost of the total project" and "[a] statement specifying the sources and extent of financing." *Id.* C.F.R. § 4.51(e).

Once an application is submitted, FERC must then play gatekeeper. The Agency's basic task is to determine which applicant's proposal is "best adapted to serve the public interest." *See id.* § 808(a)(2). That determination must include "consider[ation]" of certain statutory factors, including not only "[t]he plans and abilities of the applicant to comply with the articles, terms, and conditions of any licenses issued to it," but also "[t]he plans of the applicant to manage, operate, and maintain the project safely." *See id.* § 808(a)(2)(A)–(B).

---

"project" is defined as the "complete unit of improvement or development," which includes, inter alia, "a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith." *Id.* § 796(11).

If FERC finds the applicant and proposal suitable, it will award a license of some duration up to 50 years. *See id.* § 799 ("Licenses under this subchapter shall be issued for a period not exceeding fifty years."). But like other government-issued licenses, an FPA license comes subject to various conditions designed for the public interest, some of which are imposed by FERC,[14] and some of which are imposed by the statute.[15] To ensure the licensee's compliance with those conditions, the FPA grants FERC broad enforcement powers, including the power to revoke the license and assess a civil penalty.[16] *See id.* § 823b.

The Government's sovereign-immunity argument relies on a statutorily imposed condition found in § 803(c). As explained in Section III.B., *infra*, the Government argues that because § 803(c) exempts the Government from liability for damages caused by the "construction, maintenance, or operation" of "project works," the Government is exempt from liability for Plaintiffs' damages. *See* ECF No. 15 at PageID.71–75. (quoting 16 U.S.C. § 803(c)). Plaintiffs concede that § 803(c) exempts the Government from some damages but deny that the exemption extends to the Edenville Dam. *See* ECF No. 20 at PageID.159–65. To resolve the issue, this Court must look to the familiar canons of statutory construction.

## B.

As always, the answer "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). If "the statutory text is plain and unambiguous," the inquiry ends, and the statute is applied

---

[14] *See* 16 U.S.C. § 803(g) (authorizing FERC to impose "other conditions not inconsistent with the provisions of [the statute]").

[15] *See, e.g.*, 16 U.S.C. § 803(b) (prohibiting any "substantial alteration or addition not in conformity with the approved plans . . . without prior approval of the Commission" except in emergency circumstances).

[16] The Government also has the right to "take over" any project upon the expiration of the license, *see* 16 U.S.C. § 807(a), though apparently it has never done so, *see* J. MCGREW, FEDERAL ENERGY REGULATORY COMMISSION 223 (2009).

"according to its terms." *See Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). "But if the text is unclear, [courts] may look at the '[t]he broader context' of the statute and statutory purpose together to resolve the ambiguity." *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 431 (6th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345–46 (1997)). Whether the language is "plain and unambiguous" depends on "the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Id.* (quoting *Robinson*, 519 U.S. at 340–41).

Section 803(c) provides:

> That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain and operate said works as not to impair navigation, and shall conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property. Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.

16 U.S.C. § 803(c). The meaning of the first sentence is uncontested; by its plain terms, it requires the licensee to maintain and operate the works in an efficient manner and to conform to rules FERC promulgates for "the protection of life, health, and property." *Id.* Regarding the second sentence, the parties agree that it (1) allocates liability for damages resulting from the "construction, maintenance, or operation" of certain project works to the licensee and (2) exempts the Government from that liability. *Id.* But they disagree about the sentence's scope.

Plaintiffs argue that the clause "constructed under the license" applies to both of its antecedents: "the project works" and "the works appurtenant or accessory thereto." *See* ECF No. 20 at PageID.160–62. Thus, they conclude that the Government is exempt from damages only

when the project works were "constructed under the license."  By contrast, the Government reads "constructed under the license" as modifying only its immediate antecedent, "the works appurtenant or accessory thereto." *See* ECF No. 24 at PageID.227. So under the Government's interpretation, § 803(c) exempts the Government from damages regardless of when the project works were constructed.

The question, then, is whether "constructed under the license" modifies both antecedents—including "the project works"—or only the immediate antecedent—"the works appurtenant or accessory thereto."

The answer is critical because the Edenville Dam was not constructed under Boyce's license. Therefore, if "constructed under the license" modifies "the project works," then § 803(c) does not exempt the Government from liability for Plaintiffs' damages.

Recognizing that "the rules of grammar govern statutory interpretation," *see Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (internal quotation marks omitted), both sides marshal competing grammatical canons in support.

### i.

First, the parties invoke two syntactic canons that purport to govern modifying clauses.

Plaintiffs invoke the so-called "series-qualifier canon." *See* ECF No. 20 at PageID.161–62. The series-qualifier canon provides that "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012)). Plaintiffs contend that "constructed under the license" should be construed to modify both "the

project works" and "the works appurtenant or accessory thereto" because they are part of the same parallel construction.

The Government invokes the "rule of the last antecedent." *See* ECF No. 24 at PageID.227–28. The last-antecedent rule provides that "'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *United States v. Mateen*, 764 F.3d 627, 631 (6th Cir. 2014) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 21 (2003)); *see also* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47:33 (7th ed. 2021) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent."). So, under the last-antecedent rule, "constructed under the license" would apply only to "the works appurtenant or accessory thereto."

But the Government's interpretation has one significant weakness: the presence of a comma before the clause "constructed under the license." "As several leading treatises explain, '[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'" *Duguid*, 141 S. Ct. at 1170 (quoting WILLIAM M. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 67–68 (2016); then citing SINGER & SINGER, *supra*, § 47:33; and then citing SCALIA & GARNER, *supra*, at 161–62). Consequently, some courts have refused to limit a modifying clause to its immediate antecedent where a comma separated the two. *See, e.g.*, *Am. Int'l Grp. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013) (interpreting 12 U.S.C. § 632).

Despite *Duguid* and other authority, this Court declines to mechanically apply a general exception to an equally general rule. *See Duguid*, 141 S. Ct. at 1170 ("The rule of the last antecedent is context dependent."); *id.* ("[A] comma is *evidence* that the qualifier is supposed to

apply to all the antecedents." (emphasis added) (quoting ESKRIDGE, *supra*, at 67–68)). The Supreme Court has long warned that "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning."[17] *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993).

Indeed, canons of construction are "[not] absolute and can assuredly be overcome by other indicia of meaning." *Lockhart v. United States*, 577 U.S. 347, 352 (2016) (quoting *Barnhart*, 540 U.S. at 26); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 355 (2005) (noting other indicia of meaning "have counseled [the Court] against invoking the rule [of the last antecedent] . . . at least as many times as [the Court] has relied on it") (Souter, J., dissenting); *United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 418 (6th Cir. 2016) (finding "other indicia of meaning" rendered contract term ambiguous despite last-antecedent rule).

The Supreme Court's admonition seems especially salient here, given that Sutherland's comma rule would produce strange inconsistencies in the statute. For example, construing § 803(c)'s liability rule as conditional (i.e., as dependent on whether the project works were

---

[17] Although Sutherland's rule has curried favor in recent years, the Supreme Court has cautioned against overreliance on the presence or absence of a comma. *See United States v. Bass*, 404 U.S. 336, 340 (1971) ("The Government, noting that there is no comma after 'transports,' argues that the punctuation indicates a congressional intent to limit the qualifying phrase to the last antecedent. But many leading grammarians . . . concede that use of such commas is discretionary."); *see also United States v. Ron Pair Enters.*, 489 U.S. 235, 250 (1989) ("[P]unctuation is not decisive of the construction of a statute." (quoting *Costanzo v. Tillinghast*, 287 U.S. 341, 344 (1932) (O'Connor, J., dissenting))). Likewise, some scholars have criticized courts for uncritically adopting Sutherland's rule. *See, e.g.*, Jeremy L. Ross, *A Rule of Last Resort: A History of the Doctrine of the Last Antecedent in the United States Supreme Court*, 39 SW. L. REV. 325, 336 (2009) ("Because the question of whether to apply the Rule essentially amounts to a coin toss, it seems entirely implausible to rely on it as a method of inferring actual congressional intent or meaning."); Terri LeClercq, *Doctrine of the Last Antecedent: The Mystifying Morass of Ambiguous Modifiers*, 2 LEGAL WRITING: J. LEGAL WRITING INST. 81, 95 (1996) (arguing that Sutherland's comma rule "contradicts both common sense and the traditional role of the comma"). Accordingly, like other grammatical canons, Sutherland's rule must be applied with a careful eye toward other indicia of meaning.

"constructed under the license") seemingly undermines § 803(c)'s safety rule, which unconditionally requires a licensee to "conform to . . . [rules] prescribe[d] for the protection of life, health, and property." 16 U.S.C. § 803(c). In other words, Plaintiffs' reading would make the licensee solely responsible for safety but conditionally responsible for damages, with liability turning on whether the project works happened to be constructed under the license.

Plaintiffs' reading would also make § 803(c) an outlier within the statute. In other places where the FPA allocates some risk to the licensee, it provides no special rules for project works constructed under the license. *See id.* § 807(a) (granting the United States "the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project or projects as defined in section 796 of this title, and covered in whole or in part by the license"); *id.* § 809 (granting the United States for purposes of national security "the right to enter upon and take possession of any project, or part thereof, constructed, maintained, or operated under said license"). Indeed, the clause "constructed under the license" appears only once in the FPA, in § 803(c), where it is immediately preceded by "the works appurtenant or accessory thereto."

Accordingly, this Court declines to rely exclusively on either the last antecedent rule or the series-qualifier canon.

## ii.

Next, the parties both invoke the "canon against surplusage," which represents "the idea that 'every word and every provision [in a statute] is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting SCALIA & GARNER, *supra*, at 174).

Under Plaintiffs' interpretation, the relevant portion of § 803(c) could be rewritten as: "Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works *constructed under the license* or of the works appurtenant or accessory thereto *constructed under the license*." The Government argues that it would be redundant to impose liability for damages caused by "the *construction* . . . of the project works *constructed* under the license," because either "constructed" or "constructed under the license" would achieve the same effect. *See* ECF No. 24 at PageID.227–28. According to the Government, then, Congress must have intended "constructed under the license" to modify only "the works appurtenant or accessory thereto."

The Government's argument is unpersuasive. "The canon against surplusage is not an absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). "While it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown." *Id.* (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006)). Additionally, the canon is only helpful when "a competing interpretation gives effect to every clause and word of a statute." *Id.* (quoting *Microsoft Corp. v. I4I Ltd.*, 564 U.S. 91, 106 (2011)).

Here, neither interpretation would avoid the redundancy. Under the Government's interpretation, "construction" and "constructed under the license" would both modify "the works appurtenant or accessory thereto." For that reason, even if Plaintiffs' interpretation produces surplusage,[18] the Government has not shown that such surplusage is avoidable. *Cf. id.* (declining to decide statute's meaning based on redundancy where neither party's interpretation "g[ave] effect to every word").

---

[18] Plaintiffs could argue—though they have not had the opportunity to do so here—that "constructed under the license" is not surplusage because it clarifies the licensee's liability when the project's "operation" or "maintenance" causes the injury, not its "construction."

Plaintiffs' reliance on the canon against surplusage is similarly misplaced. Plaintiffs correctly note that the FPA "limits FERC's licensing authority to 'issuing licenses . . . for the purpose of constructing, operating, and maintaining dams . . . or other project works.'" ECF No. 20 at PageID.162–63 (quoting 16 U.S.C. § 797(e)). Therefore, Plaintiffs argue, interpreting "constructed under the license" to modify only "the works appurtenant or accessory thereto" would give the clause "constructed under the license" an effect "already achieved by the [FPA's] limits on FERC's licensing authority." *Id.* (internal quotation marks omitted). Plaintiffs seem to assume that "the works appurtenant or accessory thereto" *must* have been "constructed under the license." But nothing in the text of § 797—or any other part of the FPA—says as much. On the contrary, the FPA allows licensees to acquire, by eminent domain, property that is necessary for the project works or "the works appurtenant or accessory thereto." *See* 16 U.S.C. § 814. And like the Government, Plaintiffs have not shown how to avoid the alleged surplusage; even in their view, "constructed under the license" would still modify "the works appurtenant or accessory thereto."

Having considered the language in question, its specific context in the statute, and the canons of construction, *see Felten*, 993 F.3d at 431, this Court finds that § 803(c) is "subject to more than one reasonable interpretation." *See Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 256 (6th Cir. 2020). Accordingly, this Court must rely on legislative history and other "extra-textual sources" to ascertain its meaning. *Id.* at 253.

## C.

It is well-settled that the FPA's primary purpose was to promote the development of the nation's "long idle water power resources." *See First Iowa Hydro-Elec. Coop. v. Fed. Power Comm'n*, 328 U.S. 152, 171 (1946) ("[The legislative history] discloses both a vigorous determination of Congress to make progress with the development of the long idle water power

resources of the nation and a determination to avoid unconstitutional invasion of the jurisdiction of the states."); COGGINS & GLICKSMAN, *supra*, § 37:2 ("The [FPA and FWPA], which were unapologetically promotional, were meant to encourage private investment in hydropower development on a basis consistent with the public interest." (internal footnotes and quotation marks omitted)).

But redesigning the nation's hydropower scheme was no small feat. One of the many issues Congress faced was whether to craft a new system for determining liability for project-related damages. By enacting § 803(c), Congress ultimately decided to preserve the state-law system that was already in place. *See DiLaura v. Power Auth. of N.Y.*, 786 F. Supp. 241, 248 (W.D.N.Y. 1991) ("Most courts that have considered the meaning of § 803(c) have similarly concluded that Congress intended simply to preserve any existing cause of action under state law." (collecting cases)), *aff'd*, 982 F.2d 73 (2d Cir. 1992).

That move made good practical and political sense. In the decades before the FPA, litigants determined liability for project-related damages with state-law actions in state courts. Congress had no interest in "oust[ing] the States of their traditional authority," and presumably, the state courts had no purpose for, or notion of, federal tort liability. *See id.* Indeed, the FTCA was not enacted until 1946—over twenty years after Congress enacted § 803(c). Thus, in enacting § 803(c)—and thereby preserving the state-law system of liability—Congress simply meant to ensure that developers would remain subject to suit, and that the Government, though acting as licensor, would not be treated as guarantor.

The original version of § 803(c) arguably expressed that purpose better than the current version. The original version reported to the House of Representatives provided: "No license hereunder shall have the effect of relieving the licensee from liability for any injury or damage

occasioned by the construction, maintenance, or operation of said project works; and the United States shall in no event be liable therefor." H.R. 715, 65th Cong. (2nd Sess. 1918). That original version was met with skepticism from some members of Congress, but not because it was too harsh on licensees.

During the floor debate, Representative William Graham of Illinois expressed concern that § 803(c) was "awkward[ly]" drafted and would offer little aid to injured property owners. *See* 56 CONG. REC. 9913 (1918). He relayed the story of a dam on the Mississippi River that caused "hundreds of thousands of dollars" in flooding damage in his district. *Id.* at 9914. Because the developer dammed the river without compensating those likely to be affected, nearby farmers were forced to spend years pursuing compensation in court. *Id.* Accordingly, Graham proposed amending the Bill so that "the licens[e] [would be] taken on condition that the damages be adjusted before [the licensee] start[s] work." *Id.* The House adopted his amendment. *Id.* at 9972.

Had Graham's amendment become law, the Government would not be able to rely on § 803(c) as it does today. Graham's amendment eliminated language imparting liability for the "construction, maintenance, or operation" of project works in favor of more limited language requiring the licensee to merely settle damages before starting construction. *See* H.R. REP. No. 65-1147 (1919) (Conf. Rep.) ("Each license hereunder shall contain an express condition that the licensee shall, before the commencement of the construction of said project works, comply with all laws of the State . . . relative to damages that may be caused . . . by said proposed project works . . . ."). But by the time the Bill emerged from conference, Graham's amendment had been superseded by language nearly identical to § 803(c)'s current text. The Conference Report explained that the current language "more perfectly" accomplished § 803(c)'s purpose:

"[P]rovid[ing] that licensee shall pay *all* damages caused to the property of others." *See id.* (emphasis added).

The Conference Report is strong evidence of Congress's intent. *See In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 673 (E.D. Mich. 1999) ("The most reliable source for Congressional intent is the Conference Committee Report." (citing *Garcia v. United States*, 469 U.S. 70, 76 (1984)). And because the Conference Report indicates that the "licensee shall pay all damages," Congress likely intended for the Government's exemption to include all project works covered by the license, regardless of when they were constructed.

### D.

Plaintiffs do not address Graham's amendment, the Conference Report, or any other part of § 803(c)'s legislative history. Instead, they contend that the Government's interpretation is inconsistent with the FPA's general purpose.

First, Plaintiffs argue that Congress did not intend for § 803(c) to be "a general-purpose water-power immunity for the federal government." *See* ECF No. 20 at PageID.165. Plaintiffs cite *Beaunit Corp. v. Ala. Power Co.*, in which a manufacturer sued a licensee for decreasing the waterflow in a nearby river. 370 F. Supp. 1044 (N.D. Ala. 1973). In *Beaunit Corp.*, the manufacturer argued that § 803(c) created a private cause of action against licensees who damaged nearby properties. *Id.* at 1050. The *Beaunit* court disagreed, explaining that it was not "[Congress's] intent to create a new cause of action sounding in tort, but rather to negate the general proposition that the doing properly of that which the law itself expressly authorizes is not actionable as a nuisance." *Id.* at 1051 (citing 66 C.J.S. *Nuisances* § 17 (1973)).

Plaintiffs' reliance on *Beaunit* is therefore misplaced. Although parts of the opinion are difficult to parse, *Beaunit* seems to hold only that Congress enacted § 803(c) to clarify that

licensees were not immune from state-law actions because of their federal licenses. More can and should be said about § 803(c) today, but nothing in *Beaunit* forecloses the Government's interpretation—which cannot be fairly characterized as advocating for a "general-purpose water-power immunity." *See* ECF No. 20 at PageID.165.

Plaintiffs next argue that the Government's construction of § 803(c) is inconsistent with Congress's desire to incentivize water-power development. Plaintiffs begin by correctly noting that Congress wanted the FPA to "incentive[ize] . . . *new* water-power development" and to "ensur[e] accountability in that development." *See* ECF No. 20 at PageID.165 (emphasis in original). Plaintiffs then, without a running start, leap to conclude that "[t]he immunity provisions of [§ 803(c)] only apply where the dam [was] originally constructed under a license." *Id.* Although their reasoning is unclear, Plaintiffs seem to infer that Congress designed special liability rules for project works "constructed under the license" to incentivize new hydropower development. That inference is unwarranted as a matter of both economics and history.

First, Plaintiffs misunderstand how liability exposure affects private development. All things being equal, a rational developer would prefer to operate the project with the least exposure to liability. Accordingly, requiring licensees to accept liability for damages *only* when the project works are "constructed under the license" would *discourage* new development because it would make already constructed developments more attractive by comparison.[19] In other words, under Plaintiffs' construction, § 803(c) would have the opposite of Congress's intended effect. This Court will not "lightly conclude that Congress enacted a self-defeating statute." *See Quarles v.*

---

[19] Plaintiffs might mean to argue that the distinction would incentivize the Government to issue more licenses, but the legislative record is devoid of any indication that prospective liability chilled federal licensing.

*United States*, 139 S. Ct. 1872 (2019) (rejecting defendant's interpretation of the Armed Career Criminal Act because it would "defeat Congress's stated objective").

Similarly, Plaintiffs misunderstand why developers were averse to hydropower before the FPA. The problem was not an oversized risk of liability but the dizzying process for obtaining a license. Before the FPA, developers were forced to navigate an array of approval requirements just to obtain a license that, in many cases, offered an uncertain tenure. *See California ex rel. State Water Res. Control Bd. v. FERC*, 966 F.2d 1541, 1554 (9th Cir. 1992) (discussing history of FPA). Indeed, Congress issued perpetual licenses "on a case-by-case basis" only, which "hindered the development of a strong hydroelectric power industry." *See* COGGINS & GLICKMAN, *supra*, § 37:2. Congress's solution was to replace that "piecemeal" and "inefficient" system with a comprehensive scheme that streamlined licensing and offered license durations of up to 50 years. *See* 16 U.S.C. § 799 ("Licenses under this subchapter shall be issued for a period not exceeding fifty years."); *Escondido Mut. Water Co. v. La Jolla, Rincon, San Pasqual, Pauma, & Pala Bands of Mission Indians*, 466 U.S. 765, 773 (1984).

Section 803(c) played a different role from the sections intended to streamline licensing. As indicated, Congress enacted § 803(c) to preserve the state-law liability system and to clarify that licensees—not the Government—would "pay all damages caused to the property of others." *See* H.R. REP. NO. 65-1147 (1919) (Conf. Rep.). Simply put, there is no historical basis for believing that Congress either enacted § 803(c) to incentivize new development or wanted special liability rules for project works "constructed under the license."

But the question remains: Why would Congress include "constructed under the license" if it simply intended to assign liability to the licensee? Although the legislative record is inconclusive, the answer is likely grounded in the practical realities of hydropower development.

- 24 -

Undoubtedly, Congress was aware that in some cases the licensee would have to acquire the property necessary for the project *after* obtaining the license. *See* 16 U.S.C. § 814 (authorizing licensees to obtain certain property by eminent domain). For that reason, Congress may have deemed it unreasonable to make the licensee liable for the appurtenant and accessory works—which could encompass a great variety of physical structures—unless those works were "constructed under the license."

Whatever Congress's reasons, the result is the same: a relatively limited exception to the otherwise broad command that licensees—not the Government—"shall be liable." *Id.* § 803(c). And despite the unfortunate implications for aggrieved parties, seemingly every court to have considered § 803(c) has recognized that command. *See, e.g.*, *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 512 (9th Cir. 2005) (en banc) ("The plain language of the FPA is clear. It differentiates between the United States and licensees, and unequivocally exempts the United States from liability. When the statutory language is clear, it trumps."), *cert. denied*, 546 U.S. 1090 (2006); *Pac. Gas & Elec. Co. v. FERC*, 720 F.2d 78, 87 (D.C. Cir. 1983) ("[S]ection 10(c)'s plain purpose is to ensure that licensees, not the United States, bear the full costs of their projects."); *Pike Rapids Power Co. v. Minneapolis, St. Paul & Sault St. Marie Ry.*, 99 F.2d 902, 912 (8th Cir. 1938) (construing § 803(c) "as intended for the purpose primarily of saving the United States harmless from claims for damages"), *cert. denied*, 59 S. Ct. 362 (1939).

Absent any controlling authority to the contrary, this Court must do the same. Because § 803(c) exempts the Government from liability for Plaintiffs' damages, this case will be dismissed for lack of subject-matter jurisdiction.

**IV.**

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss, ECF No. 15, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED.**


Dated: November 16, 2021                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge